[Cite as *State v. Evans*, 2013-Ohio-2730.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellant | : | Hon. Sheila G. Farmer, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | |
| LARRY N. EVANS, JR. | : | Case No. 12CA76 |
| | : | |
| | : | |
| Defendant-Appellee | : | O P I N I O N |

CHARACTER OF PROCEEDING:        Appeal from the Richland County Court
                                of Common Pleas, Case No. 08-CR-1


JUDGMENT:                       REVERSED AND REMANDED


DATE OF JUDGMENT ENTRY:         June 21, 2013


APPEARANCES:

For Plaintiff-Appellant:                For Defendant-Appellee:

JAMES J. MAYER, JR.                     GREGORY W. MEYERS
RICHLAND CO. PROSECUTOR                 OFFICE OF OHIO PUBLIC DEFENDER
JILL M. COCHRAN                         250 East Broad St., Suite 1400
38 South Park St.                       Columbus, OH 43215
Mansfield, OH 44902

*Delaney, J.*

{¶1}   Appellant the State of Ohio appeals from the August 14, 2012 Order on Continued Commitment of appellee Larry N. Evans, Jr.

## FACTS AND PROCEDURAL HISTORY

{¶2}   Appellant and appellee stipulated to the following facts underlying appellee's indictment upon multiple capital charges.

*Appellee Kills 2 People and Fires Upon 7 Others in the Grip of a Bipolar Manic State:*
*December 26, 2007*

{¶3}   In the early morning hours of December 26, 2007, Robert Houseman was removing items from his vehicle in the driveway of his residence in Mansfield, Richland County, Ohio.  Appellee lived in the opposite side of the duplex.  Appellee came out of his house with a loaded semi-automatic rifle, approached Houseman, aimed, and fired two rounds into his chest.  Houseman fell to the ground, "shaking and quivering."  Appellee approached Houseman on the ground, wounded but still alive, aimed the assault rifle at Houseman's head, and fired again into Houseman's skull.

{¶4}   Appellee's brother, Mansfield Police Officer Brian Evans, and appellee's wife Carolyn Evans, pulled into appellee's driveway in a vehicle.  Appellee immediately fired upon Brian and Carolyn, aiming and firing through the windshield.  Brian exited the vehicle and told Carolyn to drive away.  Appellee shot Brian through the right lung and Brian died.

{¶5}   Shortly after the killings of Houseman and Brian Evans, appellee's sister, Kimberly Evans and his sister-in-law Trina Evans (Brian's wife) pulled into appellee's driveway.  Trina was driving and Kimberly was in the front passenger seat.  Appellee walked to the hood of the vehicle, "looked directly at Tina Evans," smiled, and shot her

in the shoulder. He then walked to the other side of the vehicle and shot Kimberly Evans in the arm. Trina attempted to maneuver the vehicle to escape and appellee fired repeatedly on the vehicle. Kimberly and Trina were hospitalized for the wounds sustained from being shot by appellee.

{¶6} Sgt. Michael Viars, Dep. Eric Winbigler, Lt. John King, and Dep. Duane Kilgore of the Richland County Sheriff's Office responded to the scene and appellee opened fire upon all four officers. Appellee fired numerous rounds from an assault rifle, a shotgun, a muzzleloader, and "handgun projectiles." The officers sought cover behind their cruisers.

{¶7} As a result of the shootings, the residence appellee was living in sustained $32,298 worth of damage. A Richland County Sheriff's cruiser sustained $744 worth of damage.

{¶8} Appellee was apprehended and charged by indictment with three counts of aggravated murder with firearm and death penalty specifications; three counts of attempted aggravated murder with firearm specifications; three counts of felonious assault with firearm specifications; four counts of attempted murder with firearm specifications and specifications that the offender discharged a firearm; four counts of felonious assault with a firearm specification and specification that the offender discharged a firearm; and two counts of vandalism.

*Appellee is Found NGRI and Committed to Timothy B. Moritz Hospital:*
*September 3, 2008*

{¶9} Appellee was found not guilty of the crimes charged by reason of insanity by a three-judge panel[1] on September 3, 2008. Appellee was committed to the Timothy B. Moritz Hospital ("TBM") upon a finding of insanity predicated upon an evaluation that he was in the grip of a bipolar manic psychotic state. The order of commitment filed on September 3, 2008 states in pertinent part:

* * * *.

The court finds by clear and convincing evidence that:

1. [Appellee] is a mentally ill person subject to hospitalization by court order.

2. [Appellee] is a very dangerous killer who killed two people and attempted to kill seven others, and he <u>must</u> be confined in strict custody to protect public safety. (Emphasis in original.)

3. The least restrictive commitment alternative consistent with public safety and his own welfare is Timothy B. Moritz Mental Hospital in Columbus, Ohio.

It is therefore ordered that [appellee] shall be forthwith delivered to the custody of Timothy B. Moritz Mental Hospital to be held pursuant to Ohio Revised Code sections 2945.40, 2945.401, and 2945.402 until further order of this court.

{¶10} At the conclusion of appellee's first six-month review, appellee's treatment team at TBM recommended transfer to Heartland Behavioral Healthcare, a

---

[1] Judge James DeWeese, Judge James D. Henson, and Judge Robert Konstam.

civil mental hospital in Massillon, Ohio, but an independent forensic evaluator disagreed with the treatment team's recommendation. The parties stipulated to the report of the evaluator, Dr. Bob Stinson, and the trial court determined appellee continued to be a mentally ill person subject to hospitalization by court order and that TBM was the least-restrictive placement. Appellee therefore remained at TBM.

*The Trial Court Denies Appellee's Application for Change in Commitment:*
*March 29, 2010*

{¶11} In November 2009, appellee's treatment team at TBM again recommended that appellee should be moved to HBH. The trial court[2] held an evidentiary hearing[3] on March 17, 2010.

{¶12} Appellant called three witnesses at the hearing: the captain of corrections at TBM, the chief of police at HBH, and a deputy from the Richland County Sheriff's Office familiar with appellee's behavior while incarcerated.

{¶13} Appellant's focus at the hearing was the difference in security between TBM, a maximum-security facility, and HBH, a civil hospital. The security personnel testified to the significant differences in security at the two facilities, and the HBH police chief, James Peticca, testified that he did not believe appellee was an appropriate candidate for HBH because the hospital was not equipped to handle the security risks posed by appellee. Specifically, Peticca was aware of appellee's employment history as a corrections officer and was afraid he would use that knowledge to evade HBH security.

---

[2] Judge James DeWeese.
[3] The record of this hearing was admitted as an exhibit in the subsequent commitment hearing that is the subject of the instant appeal.

{¶14} The Richland County Sheriff's deputy testified that appellee was initially placed at the Ashland County Jail in the immediate aftermath of the December 26, 2007 rampage because he was believed to be a security risk for Richland County: he had worked in the jail as a corrections officer and knew the layout. Ashland County requested appellee's return to Richland County, however, because of the problems appellee caused. Appellee constantly challenged corrections staff with behaviors such as stripping naked and greasing himself on the floor of his cell, and "tabbing" officers by secreting notes throughout his cell to determine where officers would check for contraband.

{¶15} Appellee called one witness at the hearing: Dr. Howard Sokolov, who opined that appellee's treatment was very successful and his bipolar condition was controlled by mood-stabilizing medication. Sokolov testified that appellee had no confrontational or assaultive behavior during his stay at TBM and presented no risk of flight. Sokolov recommended that appellee could be moved to a less restrictive treatment environment at HBH because, in his opinion, appellee posed no risk to public safety or any person.

{¶16} Upon cross examination, Sokolov testified appellee still suffers from bipolar disorder with psychosis that is currently in remission but which would never be "cured," and without medication appellee could have another psychotic episode. His medication would be monitored at HBH in the same manner that it was monitored at TBM, however, by testing his blood to check the levels of lithium and ensure appellee was taking his medication.

{¶17} The trial court questioned Sokolov, and asked whether the lithium medication would prevent appellee from having a psychotic episode. Sokolov responded that so far it had prevented a psychotic episode and would probably continue to prevent a relapse, but of course there are no guarantees.

{¶18} On March 29, 2010, the trial court overruled appellee's application for a change in commitment from TBM to HBH, finding by clear and convincing evidence appellee presented a threat to public and personal safety if he was moved to HBH from TBM. Appellee remained at TBM.

*Appellee's Treatment Team Recommends Change in Commitment:*
*March 2011*

{¶19} In March, 2011, appellee again filed an application for change in commitment from TBM to HBH, which appellant opposed. The trial court[4] held an evidentiary hearing over five days. This time appellant's witnesses included Dr. Karpawich, an independent investigator hired by appellant to perform an independent evaluation of appellee.

{¶20} The following evidence is adduced from the record of the hearing on appellee's March, 2011 application for change in commitment. The witnesses were taken out of order based upon their availability. Appellee and the TBM witnesses were present by video feed from the hospital.

*Narcissistic Personality Traits vs. Narcissistic Personality Disorder*

{¶21} Dr. David Soehner is a forensic psychiatrist at TBM and has been appellee's attending psychiatrist since his admission to the hospital. Appellee was originally diagnosed upon admission with bipolar disorder and he was treated with a

_____

[4] The case was transferred from Judge DeWeese to Judge Henson on April 20, 2011.

mood-stabilizing medication (Lithium) and an anti-psychotic medication (Risperdal). Appellee is no longer on any anti-psychotic medication because the Lithium successfully controls his illness and Risperdal has undesirable side effects.

{¶22} Each year, Soehner completes an annual comprehensive psychiatric examination of appellee to monitor his progress. In the September 2, 2009 report, appellee was still bipolar and no changes of note in his condition were indicated. In the September 2, 2010 report, Soehner noted a change in appellee's diagnosis: the appearance of narcissistic personality traits. Soehner clarified that narcissistic traits do not rise to the level of narcissistic personality disorder, which is a severe mental disorder causing individuals to have lifetime patterns of feeling they're entitled to certain things and react with rage if their demands and entitlements are not met; such individuals have a pathologically grandiose sense of themselves. In appellee's case, Soehner noted two narcissistic traits: a sense of entitlement and a haughty, arrogant attitude.

{¶23} Soehner testified that narcissistic personality disorder would require intensive psychotherapy and possibly medication. He again reiterated he did not find appellee to have narcissistic personality disorder, only narcissistic traits. Soehner agreed that another doctor who evaluated appellee in connection with the NGRI process had noted these traits as well, and when questioned about why they weren't noticed earlier at TBM, Soehner admitted such traits may present themselves over time. Soehner testified that appellee has received therapy at TBM in response to the narcissistic traits and that they are not significant enough to necessarily appear in appellee's treatment plan.

{¶24} On April 29, 2008, Dr. Sunbury had diagnosed appellee with bipolar disorder with narcissistic personality features. Soehner testified he disagreed with Sunbury's conclusion and with the conclusion of appellant's evaluator, Dr. Karpawich, discussed *infra*. Soehner concluded appellee has narcissistic personality traits, which are mild, whereas full-blown narcissistic personality disorder is severe.

{¶25} Soehner testified appellee stated as recently as September, 2010 that he hates taking his medication and acknowledged that appellee has a history of stopping medication on his own. The prosecutor asked whether appellee told Soehner that he is the "supreme victim" of the events of December 26, 2007, and Soehner not only agreed that appellee made the statement, but Soehner agreed with appellee, stating appellee is the "supreme victim" of his own mental illness.

{¶26} Upon cross-examination by appellee, Soehner explained that the traits he described were minor. The mild sense of entitlement, for example, arose from appellee's complaint regarding the availability of soda for visitors to the hospital. His haughty, arrogant attitude arose from bragging that he knew news around the hospital before anyone else. Soehner stated these traits are not dangerous; it is more significant, in his opinion, that appellee has responded well to treatment, has shown no violence or rage, has not refused to take his medication, and has taken responsibility for his actions.

{¶27} Upon redirect, though, appellant countered with evidence that appellee pushed boundaries regarding a staff-only bathroom, which he remarked he was good enough to clean but not good enough to use, and bragged to other patients that he found out a "Code Brown" in hospital parlance refers to a patient escape or AWOL.

{¶28} Soehner's treatment plan notes dated October 6, 2009 indicate appellee told staff he anticipated leaving TBM within two to five years.

{¶29} Dr. James Karpawich is a clinical psychologist hired by appellant to review appellee's case. In his opinion, appellee suffers from bipolar disorder and also fulfills the criteria for narcissistic traits or mixed personality disorder with narcissistic features. His opinion as to the least-restrictive treatment commitment alternative consistent with public safety and treatment of appellee is for appellee to remain at TBM. Karpawich opined that other doctors have also noted appellee's narcissistic traits, but no evidence exists these traits have been addressed in appellee's treatment. Contrary to Soehner's opinion, Karpawich testified this poses a danger because a person with these traits may become violent when challenged. It would be safer to keep appellee at TBM, therefore, because narcissistic personality traits can lead to narcissistic personality rage.

{¶30} Karpawich identified appellee's statement that he is the "supreme victim" as evidence that TBM hasn't adequately addressed his narcissistic traits because the statement is exceedingly narcissistic, grandiose, and entitled in light of the circumstances of the homicides and shootings. Moreover, in Karpawich's opinion, if Soehner agrees appellee is the "supreme victim," Soehner should not be treating appellee because narcissists lack empathy with other people and are incapable of understanding how others perceive their actions. One goal of treatment, therefore, must be to challenge the narcissist on statements like "I am the supreme victim," and not agree with him and thereby reinforce the sense of blamelessness.

{¶31} Karpawich admittedly had limited interview time with appellee, but noted that when appellee is challenged, he becomes defensive and is quick to take offense. Karpawich disagrees that appellee has taken responsibility for his actions in 2007, instead blaming his actions on his mental illness and on his doctors' failure to properly diagnose his illness earlier. This blaming of others, in Karpawich's view, is another narcissistic personality trait. Not addressing these traits creates a poor prognosis for appellee but also a risk to the safety of the next person who challenges appellee.

{¶32} Karpawich opines that there is no evidence in appellee's treatment records that his treatment team has challenged his grandiosity and sense of entitlement, or even acknowledged in his treatment plan that he has narcissistic traits. This creates the chance that if appellee is confronted and challenged, he could fly into a rage, and TBM would be a safer environment for that result than HBH.

*Conflicting Evidence Regarding Appellee as a Model Patient*

{¶33} Appellee called a number of witnesses on his behalf. His wife and daughters want his transferred to HBH; other family members (and victims) strongly disagree. Members of his treatment team testified to appellee's successful treatment at TBM, describing him as a high functioning, model patient who is compliant with their recommendations. Testimony was presented that appellee's work history as a corrections officer has been taken into account and does not place him at any higher risk for escape.

{¶34} Cross-examination of these witnesses, however, produced conflicting information about how much they knew about appellee's history, including the events

of December 26, 2007 and appellee's substance abuse, and how much they simply relied on what appellee told them.

*Changes at HBH*

{¶35} Appellant called James Peticca again, now former chief of police at HBH. Peticca received a five-day suspension as a result of his testimony at the first hearing and was ultimately terminated. The new chief of police at HBH is the former maintenance supervisor.

{¶36} Appellee called Jeffrey L. Sims, the C.E.O. of HBH, a new hire since the last hearing. Sims indicated he had no problem with appellee coming to HBH and in light of security upgrades to HBH, did not foresee a security risk. Appellee would be placed at "level one" movement at HBH, which means he would be on a locked patient unit which is a large area with bedrooms, a dining area, a TV room, and an exercise room. The entrance to this locked ward is akin to a sally port with two locked doors; to enter, an individual must come in, close a door behind them, then enter another locked door. Sims testified that before he came to HBH, a 20-foot brick wall was built to address security concerns such as those expressed by James Peticca in the earlier hearing. There has been one escape from HBH since the wall was built.

{¶37} HBH has its own police force of eight officers total, with one to three officers working at any given time. HBH does not have metal detectors, a "control room" of cameras for centralized monitoring, or systematic observation of the perimeter of the facility. If a patient attempts to escape or creates a problem on a unit, staff members' option is to use the telephone to call for assistance. Sims

acknowledged it is easier to escape from HBH than from TBM, which is to be expected because HBH is a civil hospital while TBM is a maximum-security facility.

{¶38} In preparation for this hearing, Sims toured TBM. To his surprise, during the visit appellee approached him and introduced himself.

*Stinson Now Recommends Transfer*

{¶39} Appellee's final witness was Dr. Bob Stinson, who is an employee of Twin Valley (the facility of which TBM is a part) but not a member of appellee's treatment team. Stinson performed an earlier evaluation of appellee and did not recommend movement to a less-restrictive setting, but his opinion has evolved. Twin Valley asked Stinson to perform an independent review of appellee after the treatment team recommended movement to HBH. Stinson opined that appellee does continue to be a mentally ill person subject to hospitalization by court order, and balancing his needs with public safety, Stinson recommends movement to a civil hospital such as HBH. Stinson agrees that appellee suffers from bipolar disorder, which has psychotic features when it is severe, but says appellee is now stable, and in long-term remission, in large part due to medication. In Stinson's opinion, appellee does not have narcissistic personality traits, much less narcissistic personality disorder. Even assuming for the sake of argument appellee has such traits, keeping appellee at TBM is too restrictive.

*Appellee is Demonstrably Volatile*

{¶40} Because it is relevant to our decision, we note two incidents that occurred during the hearing. The TBM witnesses testified by video feed from the facility; appellee was also present by video, in the same room as the witnesses.

During the testimony of Dr. Helen Rodebaugh, a member of his treatment team, the prosecutor noted for the record that appellee was placing his hand on and off the mute button during her testimony and had to be instructed not to do so by the court. At another point in the hearing, the prosecutor noted that appellee refused to move to a different seat at the witness table that his counsel directed him to. Appellee hit the mute button and spoke to a witness during her testimony (presumably Rodebaugh), and when the trial court told him to move away, appellee banged his chair against the wall.

*The Trial Court Grants Application to Transfer to HBH:*
*August 2012*

{¶41} On August 14, 2012, the trial court ruled appellee should be moved to HBH. The trial court noted in the judgment entry that the decision took into account a trip to HBH to view the grounds and security arrangements. The trial court's entry states in part:

> * * * *.
>
> To approach without trepidation the decision of security level for the safety of the community in relationship to [appellee] would be folly. [Appellee] remains a seriously mentally ill individual who by his own volition stopped taking prescribed medications that apparently led him to kill two (2) individuals and seriously wound others. This Court does not get a sense of security from the head of the treatment team at [TBM] who apparently now believes that [appellee] is no longer dangerous because he, [appellee], now knows and fully recognizes the consequences of failing to

maintain his medical protocol. While [appellee] appears to be rational while in a non threatening environment where his every move is observed and where compliance with every treatment mode is guaranteed, it is very difficult and actually impossible for me to make the leap to the conclusion that he is no longer a danger to himself and to those around him particularly in light of the fact that on at least two (2) occasions prior to his recent hospitalizations, he quit and refused to stay on a medical regimen prescribed to prevent the very kind of activity [appellee] engaged in.

Based upon his history of voluntary non compliance while not in a sterile hospital environment, it may be difficult in the future with any degree of assurance for the safety of [appellee] and the community at large to suggest that he should be allowed any degree of freedom to roam at large in society.

For now, it is the decision of the Court that [appellee] remains a seriously mentally ill individual subject to continued hospitalization and that the least restrictive placement at this time would be [HBH].

* * * *.

{¶42} Appellant appeals from the August 14, 2012 Order on Continued Commitment permitting transfer of appellee to HBH.

**ASSIGNMENTS OF ERROR**

{¶43} Appellant raises one Assignment of Error:

{¶44} "I. THE TRIAL COURT ERRED WHEN IT DETERMINED THAT THE STATE DID NOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE CHANGE IN COMMITMENT SETTING WAS A THREAT TO PUBLIC SAFETY OR THE THREAT TO THE SAFETY OF ANY PERSON."

**ANALYSIS**

**I.**

{¶45} Appellant argues the trial court erred in determining it did not establish by clear and convincing evidence that the change in commitment setting was a threat to public safety or a threat to the safety of any person. We agree.

{¶46} We begin with the statutory authority by which appellee was placed at TBM. Pursuant to R.C. 2945.40, appellee was found not guilty by reason of insanity and was placed by the trial court at TBM, the only maximum-security psychiatric hospital in Ohio. As long as appellee is determined to be a mentally-ill person subject to hospitalization by court order, the trial court is tasked with determining the appropriate placement with the following standard in mind:

> If, at the hearing under division (A) of this section, the court finds by clear and convincing evidence that the person is a mentally ill person subject to hospitalization by court order, the court shall commit the person either to the department of mental health for treatment in a hospital, facility, or agency as determined clinically appropriate by the department of mental health or to another

medical or psychiatric facility, as appropriate. Prior to placing the defendant, the department of mental health shall obtain court approval for that placement. * * * *. Further proceedings shall be in accordance with sections 2945.401 and 2945.402 of the Revised Code. **In determining the place of commitment, the court shall consider the extent to which the person is a danger to the person and to others, the need for security, and the type of crime involved and shall order the least restrictive alternative available that is consistent with public safety and the welfare of the person. In weighing these factors, the court shall give preference to protecting public safety.**

R.C. 2945.40(F) [Emphasis added].

{¶47} Appellee remains hospitalized and subject to institutionalization by court order. R.C. 2945.401 addresses requests for change in the conditions of commitment and states in pertinent part:

* * * *.

(C) The department of mental health or the institution, facility, or program to which a defendant or person has been committed under section 2945.39 or 2945.40 of the Revised Code shall report in writing to the trial court, at the times specified in this division, as to whether the defendant or person remains a mentally ill person subject to hospitalization by court * * *. The department, institution, facility, or program shall make the reports

after the initial six months of treatment and every two years after the initial report is made. The trial court shall provide copies of the reports to the prosecutor and to the counsel for the defendant or person. Within thirty days after its receipt pursuant to this division of a report from the department, institution, facility, or program, the trial court shall hold a hearing on the continued commitment of the defendant or person or on any changes in the conditions of the commitment of the defendant or person. The defendant or person may request a change in the conditions of confinement, and the trial court shall conduct a hearing on that request if six months or more have elapsed since the most recent hearing was conducted under this section.

(D)(1) Except as otherwise provided in division (D)(2) of this section, when a defendant or person has been committed under section 2945.39 or 2945.40 of the Revised Code, at any time after evaluating the risks to public safety and the welfare of the defendant or person, the designee of the department of mental health or the managing officer of the institution or director of the facility or program to which the defendant or person is committed may recommend a termination of the defendant's or person's commitment or a change in the conditions of the defendant's or person's commitment.

* * * *.

(G) In a hearing held pursuant to division (C) or (D)(1) of this section, the prosecutor has the burden of proof as follows:

* * * *.

(2) For a recommendation for a change in the conditions of the commitment to a less restrictive status, to show by clear and convincing evidence that the proposed change represents a threat to public safety or a threat to the safety of any person.

(H) In a hearing held pursuant to division (C) or (D)(1) or (2) of this section, the prosecutor shall represent the state or the public interest.

(I) At the conclusion of a hearing conducted under division (D)(1) of this section regarding a recommendation from the designee of the department of mental health, managing officer of the institution, or director of a facility or program, the trial court may approve, disapprove, or modify the recommendation and shall enter an order accordingly.

R.C. 2945.401.

{¶48} The issue before us, therefore, is whether appellant clearly and convincingly established the proposed transfer of appellee to HBH represents a threat to public safety or a threat to the safety of any person. The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance,

but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *State v. Aduddell*, 5th Dist. No. 2010-CA-00137, 2011-Ohio-582, ¶ 16, citing *In re: Estate of Haynes*, 25 Ohio St.3d 101, 103–104, 495 N.E.2d 23 (1986). "Clear and convincing evidence" is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *State v. Roden*, 8th Dist. No. 95507, 2011-Ohio-2788, ¶ 12, citing *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 481 N.E.2d 613. "In reviewing weight-of-the-evidence arguments where the plaintiff's burden below is clear and convincing evidence, an appellate court will not reverse judgments supported by some competent, credible evidence going to all the essential elements of the case." *State v. Mahaffey*, 140 Ohio App.3d 396, 402, 2000-Ohio-1940, 747 N.E.2d 872 (4th Dist.2000), citing *State v. Schiebel*, 55 Ohio St.3d 71, 74-75, 564 N.E.2d 54 (1990).

{¶49} In *Aduddell*, we determined the state did not meet its burden because it did not seek an expert opinion to refute the transfer recommendation, presented no evidence that transfer would place the public at risk, and offered no evidence of the unsuitability of the facility to which the appellant would be transferred. *Aduddell*, supra, 2011-Ohio-582 at ¶ 33. In the instant case, appellant presented the opinion of Karpawich to rebut the transfer recommendation of appellee's treatment team, presented evidence that the transfer would place the public at risk, and presented evidence that HBH is a less secure facility than TBM.

{¶50} It is evident from the extraordinary record of the five-day hearing in this case that the trial court took this decision extremely seriously and struggled with it.

We are not quick to second-guess the decision of a fact finder that went so far as to visit the facility in question to determine its suitability.

{¶51} In reviewing the record of this case as a whole, however, we find we are constrained by the mandate of R.C. 2945.40(F), specifically, that the court shall give preference to public safety. While there is evidence that appellee is responding well to treatment and his bipolar condition is in remission, we find appellant met its burden and established, by clear and convincing evidence, the proposed transfer represents a threat to public safety or the safety of any person. R.C. 2945.401(G)(2). Too many questions remain about the efficacy of appellee's diagnosis and treatment. We fully acknowledge we are not mental health professionals and it is beyond the scope of our authority to determine whether appellee has narcissistic traits or narcissistic personality disorder. We are compelled to find, however, appellant did establish, convincingly, that movement of appellee to a less-restrictive civil hospital setting poses a threat to public safety in light of appellee's present mental health status, the events of December 26, 2007, his history of mental illness, his background as a corrections officer, and inherent differences in security levels between the two facilities.

{¶52} We find appellee remains a mentally ill person subject to hospitalization by court order and the least restrictive commitment alternative consistent with public safety and his own welfare is TBM.

## CONCLUSION

{¶53} For the foregoing reasons, the August 14, 2012 judgment of the Richland County Court of Common Pleas is reversed and the matter is remanded for further proceedings consistent with this opinion.

By: Delaney, J.

Gwin, P.J. and

Farmer, J. concur.

_____
HON. PATRICIA A. DELANEY

_____
HON. W. SCOTT GWIN

_____
HON. SHEILA G. FARMER

PAD:kgb

IN THE COURT OF APPEALS FOR RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | : | |
| STATE OF OHIO | : | |
| | : | |
| Plaintiff - Appellant | : | JUDGMENT ENTRY |
| | : | |
| -vs- | : | |
| | : | |
| LARRY N. EVANS | : | Case No.   12CA76 |
| | : | |
| Defendant - Appellee | : | |
| | : | |
| | : | |

For the reasons stated in our accompanying Opinion on file, the judgment of the Richland County Court of Common Pleas is reversed and this matter is remanded to the trial court for proceedings consistent with this opinion.   Costs assessed to appellee.

_____
HON. PATRICIA A. DELANEY

_____
HON. W. SCOTT GWIN

_____
HON. SHEILA G. FARMER